Adam R. Pechtel / WSBA #43743
Pechtel Law PLLC
21 N Cascade St
Kennewick, WA 99336
Telephone: (509) 586-3091

Attorney for Plaintiff

United States District Court
Eastern District of Washington

| | |
|---|---|
| Lisa Samson, a married woman,<br><br>                              Plaintiff,<br><br>v.<br><br><br>Preferred Freezer Services of Richland, LLC;<br><br>                              Defendant. | No.  19-CV-5004<br><br>Complaint for Damages and Jury Demand |

### I.   Complaint

1.   Being the victim of unlawful sex discrimination and retaliation, Lisa Samson alleges the following facts and asserts the following claims:

## II.    Jurisdiction and Venue

2.    This civil action arises under the laws of the United States, namely Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. Consequently, this Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

3.    Plaintiff's state law claims are so related to the claims identified in paragraph two that they form part of the same case or controversy under Article III of the United States Constitution. Consequently, this court has supplemental subject matter jurisdiction over those claims pursuant to 28 U.S.C. § 1367.

4.    Plaintiff Lisa Samson is a married woman who has resided in Benton County, Washington at all times relevant times.

5.    Defendant Preferred Freezer Services of Richland, LLC is a limited liability company organized under the laws of the State of Washington and doing business in Benton County, Washington.

6.    On information and belief, Defendant Preferred Freezer Services of Richland, LLC is a wholly owned subsidiary of Preferred Freezer Services, LLC, a limited liability company incorporated under the laws of the State of Delaware.

7.    Defendant Preferred Freezer Services of Richland, LLC (hereinafter Defendant Preferred Freezer) employed Plaintiff Lisa Samson (hereinafter Plaintiff Samson) to work primarily in the Eastern District of Washington. A substantial part of the events or omissions giving rise to the claims herein described occurred in the Eastern District of Washington. Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(2).

8.    At all relevant times, Defendant Preferred Freezer employed in excess of fifteen employees and was an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and Washington's Law Against Discrimination, RCW 49.60.

**III.    Administrative Prerequisites**

9.    Plaintiff Samson has complied with all administrative prerequisites required to file this lawsuit by timely filing a formal charge with the Equal Employment Opportunity Commission (hereinafter EEOC), and timely filing this Action within ninety days of the receipt of the Notice of Right to Sue issued by the EEOC.

Complaint for Damages and
Jury Demand - 3

10.    A true and correct copy of the charge of discrimination filed by Plaintiff Samson with the EEOC is attached hereto as Exhibit A and is incorporated herein by reference.

11.    A true and correct copy of the notice of right to sue issued to Plaintiff Samson by the EEOC is attached hereto as Exhibit B and is incorporated herein by reference.

## IV.    Statement of Facts

### A. *Plaintiff Samson's Employment History and Hire at Defendant Preferred Freezer*

12.    Prior to her employment at Defendant Preferred Freezer, Plaintiff Samson worked for Columbia Colstor for about two years.

13.    Columbia Colstor was a third-party warehousing and logistics company.

14.    Defendant Preferred Freezer is also a third-party warehousing and logistics company.

15.    Around January 2015, Columbia Colstor was purchased by another company.

16.    The new company executed a reduction in force in June 2015.

17.    Plaintiff Samson resigned in May 2015 before the layoff in order to be home with her family.

Complaint for Damages and
Jury Demand - 4

18.   About August 2016, Plaintiff Samson returned to work. She was hired by Kadlec Regional Medical Center in the house cleaning department to work on a per diem basis.

*B. Plaintiff Samson's Hire at Defendant Preferred Freezer*

19.   In February 2017, Plaintiff Samson visited some former co-workers from Columbia Colstor at Defendant Preferred Freezer's Richland location.

20.   Francisco Cortez, a supervisor, told Plaintiff Samson that Defendant Preferred Freezer was hiring.

21.   Plaintiff Samson applied for a position with Defendant Preferred Freezer.

22.   Defendant Preferred Freezer hired her as a Customer Service Representative earning $16.50 per hour on February 9, 2017.

23.   Plaintiff Samson's compensation also included benefits consisting of dental insurance, vision insurance, short term disability insurance, long term disability insurance, and a defined contribution retirement plan.

24.   Plaintiff Samson's first day of work was February 14, 2017.

25.   Plaintiff Samson's first week of work was spent training during the day.

26.    Defendant Preferred Freezer has four shifts: Day Shift 1, Day Shift 2, Night Shift 1, and Night Shift 2. Day Shift 1 and Night Shift 1 work Sunday, Monday, Tuesday, and every other Wednesday. Day Shift 2 and Night Shift 2 work every Thursday, Friday, Saturday, and every other Wednesday.

27.    After training for a week, Plaintiff Samson began working on Night Shift 2.

### C. Plaintiff Samson's Supervisory Chain

28.    At this time, Kevin Allen was Operations Manager for Night Shift 2. His job duties included supervising Plaintiff Samson's job performance.

29.    Kevin Allen had the authority to terminate the employment of any employee on Night Shift 2, including Plaintiff Samson.

30.    Kevin Allen reported to Senior Operations Manager Ed Gottschalk.

31.    Ed Gottschalk reported to General Manager Burnie Taylor.

### D. Plaintiff Samson is Exposed to Sexual Language and Conduct

32.    Plaintiff Samson performed her job duties in the control room. This section of the warehouse was responsible for dispatching

1  trucks from Defendant Preferred Freezer's warehouse to deliver

2  frozen potato products to customers.

3  33.   While Plaintiff Samson was still in training, Kevin Allen told

4  the employees on Night Shift 2 to stop the "dock talk" because a

5  "churchy woman" would soon be joining the Night Shift 2.

6  34.   "Dock talk" meant crass, crude, rude and sexual language.

7  35.   Ed Gottschalk and Burnie Taylor told Kevin Allen to tell this

8  to his employees.

9  36.   The "dock talk" stopped for about one week and then

10  resumed.

11  37.   Kevin Allen was the primary instigator of sexual language and

12  conduct around Plaintiff Samson. Other employees would join in

13  the sexual language and conduct. Kevin Allen and other employees

14  including Ed Gottschalk, Frankie Murillo, Aracelli (last name

15  unknown), Josh Scott, Josh Gardner and other employees engaged

16  in sexually explicit conversation (e.g., talking about "jacking off"),

17  sexually explicit jokes, and watched unmuted pornographic videos

18  on their phones in the Control Room.

19  38.   On at least one occasion, Kevin Allan told the following joke

20  in the Control Room.  He asked "What is long and hard and full of

Complaint for Damages and
Jury Demand - 7

1
2
3

seamen? A submarine." The men in the Control Room at the time laughing. Kevin Allan began talking about him being long and hard.

4
5
6
7

39.  Jenny Kenworthy also worked in the Control Room. On several occasions, Ms. Kenworthy asked Kevin Allan to come over to her when she had a question. Kevin Allan's typical reply was "Come? I would love to cum."

8
9
10
11

40.  On many occasions, Kevin Allan and Araceli (last name unknown) looked up words and phrases in Urban Dictionary and then read the definitions aloud. These words and phrases included perverted sexual activities with objects and animals.

12
13
14

41.  On another occasion, Kevin Allan told employees in the Control Room how mad his wife made him and that he was going to turn her over and have his way with her.

15
16
17
18
19

42.  On many occasions, Kevin Allan told male co-workers that he was going to show them pornography. Kevin Allan told Plaintiff Samson to satay in her chair because she would not want to see them. Kevin Allan and the other male co-workers would then comment on what they were seeing.

20

43.   On several occasions, Araceli (last name unknown) would pull her shirt tight or pull it down so Kevin Allan could "check out" her breasts. Kevin Allan made many comments about her breasts.

44.   These behaviors occurred every day Plaintiff Samson worked.

45.   Plaintiff Samson was offended by these behaviors.

46.   After about three months, Plaintiff Samson had had enough. She made an appointment to speak with the General Manager Burnie Taylor about transferring to a new shift to get away from the sexual language and conduct.

47.   The night before that appointment, Plaintiff Samson spoke with Kevin Allen privately. Plaintiff Samson told him that she was going to ask for a shift transfer because of his sexual language and conduct.

48.   Kevin Allen apologized, said he would clean up his language, and asked if she would stay on his shift.

49.   She agreed.

50.   The next day Burnie Taylor spoke with Plaintiff Samson. She told him about Kevin Allen's comments about the sexual comments, jokes, and porn. He told her he would take care of it.

51.    Kevin Allen stopped the sexual conversation, jokes, and pornography for a few weeks, but then he resumed.

52.    On one occasion in March 2018, Kevin Allen held a conversation with his leads in the control room. He informed them that he jacks off when he gets home from work. He told them they could too, when they got home. Josh Gardner said that he could not jack off because his wife was asleep in bed. Kevin Allen told Josh Gardner that he should jack off on the couch. Josh Gardner replied that his kids would wake up and come downstairs. Kevin Allen told Josh Gardner to get a heavy blanket.

53.    On another occasion in April 12, 2018, Plaintiff Samson was clocking in for her shift. Josh Scott was behind her. Plaintiff Samson heard him tell someone else that he was going to tell them a joke, but then said "never mind, it's dirty, and Lisa is here" or words to that effect.

54.    About April 12, 2018, Plaintiff Samson complained to Kevin Allen about his sexual comments again. She told him she doesn't care how "big or small his dick is" or "how often he jacks off" and that she shouldn't have to hear that. Plaintiff was upset during this conversation and crying.

55. Plaintiff Samson told Kevin Allen that every time she confronted him about the sexual language and conduct, he would stop for a short period of time and then resume his old behavior. Kevin Allen asked Plaintiff Samson to remind him when this happened. Plaintiff Samson told him it was not her job to remind him.

56. The morning of April 13, 2018, Ed Gottschalk called Plaintiff Samson. Ed Gottschalk admitted he knew about Plaintiff Samson's confrontation with Kevin Allen the day before.

57. On April 14, 2018, Plaintiff Samson did not work. The other employees immediately resumed the sexually explicit language and behavior. Aracelli (last name unknown) said "I'm glad Lisa's not here so we don't have to watch what we say" or words to that effect. Plaintiff learned about this from another co-worker who was not participating in the sexual language or conduct.

> *E. Escalation of Complaint to Corporate Human*
> *Resources & Investigation*

58. On April 16, 2018, Plaintiff Samson emailed Vanessa Jackson.

59.    Vanessa Jackson is Preferred Freezer Services, LLC's corporate manager of human resources in New Jersey.

60.    On April 17, 2018, Ed Gottschalk called Plaintiff Samson He apologized for Kevin Allen's behavior. He gave her a $0.25 per hour raise. This was on top of her annual raise of $0.50 per hour.

61.    Vanessa Jackson and Plaintiff Samson spoke by phone for a few minutes on April 18, 2018. Vanessa Jackson asked Plaintiff Samson to give Vanessa Jackson a few days before Plaintiff Samson said or did anything.

62.    On April 23, 2018, Vanessa Jackson called Plaintiff Samson. Vanessa Jackson told Plaintiff Samson that Claudia Moreno and Larry Fashion were coming to investigate her allegations.

63.    Plaintiff Samson told Vanessa Jackson that Plaintiff Samson was leaving on Sunday (April 29, 2018) for two weeks to visit Plaintiff Samson's new grandchild in Boston.

64.    On April 26, 2018, Claudia Moreno and Larry Fashion came to Richland. They spoke with Plaintiff Samson. Plaintiff Samson told them about the sexual conversation, jokes, and pornography.

65.    On April 27, 2018, Claudia Moreno and Larry Fashion finished their investigation.

66. Larry Fashion informed Plaintiff Samson that other employees corroborated her allegations.

67. The same day, Claudia Moreno, Larry Fashion, Plaintiff Samson and Plaintiff Samson's husband met at Shari's restaurant on George Washington Way, Richland, Washington.

68. Larry Fashion told Plaintiff Samson she would be opening a new can of worms if she returned to work at Defendant Preferred Freezer after her two-week vacation.

69. He told her that Defendant Preferred Freezer could not prevent retaliation.

70. They offered Plaintiff Samson two months salary in exchange for a release of liability and her resignation.

71. Larry Fashion and Claudia Moreno pressured Plaintiff Samson to accept the settlement. They called and emailed her multiple times within a few days.

72. Plaintiff Samson was on vacation from April 27, 2018 to May 15, 2018.

73. Plaintiff Samson did not take the settlement.

74. She returned to work on May 16, 2018.

75.   Defendant Preferred Freezer scheduled a sexual harassment class May 23, 2018 at 5:00 pm.

76.   Plaintiff Samson could not attend the training due to previous engagements. At her request, her training was rescheduled for May 24th.

77.   When she arrived for the class, she learned that Vanessa Jackson and Claudia Moreno were the instructors.

78.   Plaintiff Samson did not feel comfortable with Claudia Moreno teaching the class because of how Claudia Moreno pressured her to sign the settlement.

79.   The class was interactive. It required participants to role play different scenarios.

80.   Frankie Murillo, one of the participants in the sexual language and conduct, was present at the sexual harassment class that Plaintiff Samson attended.

81.   Plaintiff Samson felt uncomfortable roleplaying sexual harassment with one of the perpetrators.

82.   She left the class.

*F. Plaintiff Samson's Injuries*

83.    Plaintiff Samson's exposure to the sexual language and conduct combined with Kevin Allen, Ed Gottschalk and Burnie Taylor failure to prevent and correct the sexual language and conduct proximately caused Plaintiff Samson emotional pain and suffering, inconvenience, loss of health, humiliation, indignity, marital strain, loss of self-esteem, anxiety, depression, isolation, grief, crying, sleeplessness, fatigue, and gastrointestinal problems.

84.    Plaintiff Samson was prescribed and began taking anti-depressants to treat the depression caused by the sexual harassment.

85.    The sexual harassment and retaliation caused a flare up of Plaintiff Samson's rheumatoid arthritis.

**V.    Claims for Relief**

> *A. Sexual harassment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.*

86.    Plaintiff Samson was subjected to verbal conduct of a sexual nature.

87.    The conduct was unwelcome.

---

88.    The conduct was sufficiently severe or pervasive to alter the conditions of the Plaintiff Samson's employment and create a sexually abusive or hostile work environment.

89.    Plaintiff Samson perceived the working environment to be abusive or hostile.

90.    A reasonable woman in Plaintiff Samson's circumstances would consider the working environment to be abusive or hostile.

91.    Defendant Preferred Freezer acted with reckless indifference to Plaintiff Samson's federally protected rights.

*B. Sexual harassment in violation of the Washington Law Against Discrimination, RCW 49.60 et seq.*

92.    There was language or conduct of a sexual nature;

93.    This language or conduct was unwelcome in the sense that Plaintiff Samson regarded the conduct as undesirable and offensive, and did not solicit or incite it.

94.    This conduct or language was so offensive or pervasive that it altered the conditions of Plaintiff Samson's employment.

95.    Kevin Allen, a manager of Defendant Preferred Freezer, participated in the conduct or language.

96.    Alternatively, Ed Gottschalk and Burnie Taylor (both of whom are managers of Defendant Preferred Freezer) knew through Plaintiff Samson's complaints and personal observation of Kevin Allen's language and conduct, and Defendant Preferred Freezer failed to take reasonably prompt and adequate corrective action reasonably designed to end it.

### C. Tort of Outrage

97.    Kevin Allen engaged in extreme and outrageous conduct by watching unmuted pornographic videos in the same room as Plaintiff Samson, telling sexual jokes, commenting on female employee's breasts, and engaging in other sexually explicit language and conduct.

98.    He acted intentionally or recklessly.

99.    His conduct actually and proximately caused Plaintiff Samson to experience severe emotional distress.

100.    Defendant Preferred Freezer is vicariously liable for this tort Defendant Preferred Freezer ratified Kevin Allen's behavior.

### D. Negligent Training & Supervision

101.    Kevin Allen acted outside the scope of his employment.

102.    He presented a risk of harm to other employees.

103. Defendant Preferred Freezer knew or should have known in the exercise of reasonable care that he posed a risk of harm to others.

104. Defendant Preferred Freezer Services' failure to train and supervise him was the proximate cause of injuries to Plaintiff Samson.

*E. Negligent Infliction of Emotional Distress*

105. Defendant Preferred Freezer owed Plaintiff Samson a duty of care to prevent offensive sexual language and conduct in the workplace.

106. Defendant Preferred Freezer breached the standard of care by failing to adequately train and supervise Plaintiff Samson's supervisors and co-workers who engaged in offensive sexual language and conduct in the workplace.

107. Defendant Preferred Freezer's breach was the proximate cause of Plaintiff Samson's emotional distress.

108. The emotional distress did not result from Defendant Preferred Freezer's disciplinary acts or its response to a workplace personality dispute.

109. Plaintiff Samson suffered damages in the form of emotional distress.

110. Plaintiff Samson's emotional distress is demonstrated by objective symptomatology in the form of aggravating her rheumatoid arthritis.

## VI.    Prayer for Relief

111. Compensatory damages for lost wages and benefits, emotional pain and suffering, inconvenience, loss of health, humiliation, indignity, marital strain, loss of self-esteem, anxiety, depression, isolation, grief, crying, sleeplessness, fatigue, gastrointestinal problems, and aggravation of rheumatoid arthritis in an amount exceeding $250,000 to be proven at trial;

112. Punitive damages of $300,000.

113. Reasonable attorneys' fees and costs of suit;

114. Declaratory judgment that Defendant Preferred Freezer's acts, policies and procedures identified in this complaint violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964, 42 USC 2000e *et seq.* and the Washington Law Against Discrimination, RCW 49.60 *et seq.*

115. Issuance of a permanent injunction enjoining Defendant Preferred Freezer, its officers, successors, assigns, and all persons in active concert or participation with it, from engaging in employment practices that discriminate against persons on the basis of their sex in regard to the terms and conditions of employment.

116. Order Defendant Preferred Freezer to institute and carry out policies, practices, and programs that provide equal employment opportunities for individuals regardless of their sex, and that eradicate the effects of its past and present unlawful employment practices, to include but not limited to policies prohibiting the consumption of pornography in the workplace, use of company assets such as email or phones to distribute or consume pornography, and mandatory disciplinary procedures for employees found to have engaged in sexually explicit activity in the workplace.

117. Order Defendant Preferred Freezer to institute and carry out policies, practices, and programs that provide equal employment opportunities for individuals regardless of their sex, and that

eradicate the effects of its past and present unlawful employment practices.

118. For such other and further relief as this court deems just and equitable.

## VII.   Jury Demand

The Plaintiff requests trial by a six-member jury.


Dated: January 8, 2019                 Respectfully Submitted,

                                       s/Adam R. Pechtel
                                       Adam R. Pechtel/ WSBA #43743
                                       Attorney for Plaintiff
                                       Pechtel Law PLLC
                                       21 N Cascade St
                                       Kennewick, WA 99336
                                       Telephone: (509) 586-3091
                                       Email: adam@pechtellaw.com